UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| THE CONCERNED BLACK CLERGY OF METROPOLITAN ATLANTA, INC., et al., | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 1:21-cv-01728-JPB |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, et al., | |
| Defendants. | |

## **ORDER**

Before the Court are the following motions:

1. Defendants Brad Raffensperger, Rebecca Sullivan, David Worley, Matthew Mashburn and Anh Le's (collectively "State Defendants") Motion to Dismiss Complaint (ECF No. 46); and

2. Defendants Republican National Committee, National Republican Senatorial Committee, National Republican Congressional Committee and Georgia Republican Party, Inc.'s (collectively "Intervenor Defendants") Motion to Dismiss or Alternatively for Summary Judgment (ECF No. 47).[1]

Having fully considered the papers filed therewith, the Court finds as follows:

---

[1] State Defendants and Intervenor Defendants are collectively referred to as "Defendants."

## I.   <u>BACKGROUND</u>

Plaintiffs The Concerned Black Clergy of Metropolitan Atlanta, Inc., The Justice Initiative, Inc., Samuel Dewitt Proctor Conference, Inc., Mijente, Inc., Sankofa United Church of Christ Limited, Metropolitan Atlanta Baptist Ministers Union, Inc., First Congregational Church, United Church of Christ Incorporated, Georgia Latino Alliance for Human Rights, Inc., Faith in Action Network, Greater Works Ministries Network, Inc. and Exousia Lighthouse International C.M., Inc. (collectively "Plaintiffs") filed this action seeking injunctive and declaratory relief with respect to certain provisions of Georgia Senate Bill 202 ("SB 202"). Governor Brian Kemp signed SB 202 into law on March 25, 2021, and the challenged provisions regulate election-related processes and activities ranging from absentee ballot voting to out-of-precinct in-person voting.

Plaintiffs allege that the challenged provisions violate the United States Constitution, the Voting Rights Act ("VRA") and the Americans with Disabilities Act ("ADA").  Specifically, Plaintiffs oppose the specified regulations on the following grounds:  discrimination, undue burden on the right to vote and abridgement of free speech and expression.

II.     **DISCUSSION**

Intervenor Defendants seek dismissal of Plaintiffs' claims on the merits

only, and State Defendants seek dismissal both on standing grounds and on the

merits.  The Court will first address two threshold issues—whether Intervenor

Defendants' Motion to Dismiss is timely and whether Plaintiffs lack standing to

bring their claims.

A.      **Timeliness of Intervenor Defendants' Motion to Dismiss**

Intervenor Defendants raise the issue of the timing of their motion to

dismiss.  In accordance with Federal Rule of Civil Procedure 24(c), Intervenor

Defendants submitted a proposed answer to the Complaint at the time they sought

permission to intervene.  When their motion to intervene was granted, their

proposed answer became part of the record.  As such, the instant Rule 12(b)(6)

motion to dismiss, which was filed after the answer became part of the record, is

technically untimely.  *See Byrne v. Nezhat*, 261 F.3d 1075, 1093, n.35 (11th Cir.

2001) (stating that the defendant's motion to dismiss pursuant to Rule 12(b)(6),

which was filed after the defendant answered the complaint, was "in effect a

nullity"), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co*,

553 U.S. 639 (2008).

Intervenor Defendants have not cited, and the Court is not aware of, any legal authority that directly addresses whether the Court has discretion to consider a late-filed motion to dismiss in the unique circumstances of intervention. Intervenor Defendants, in "an abundance of caution," alternatively styled their motion as one for summary judgment, which can be filed at any time. Intervenor Defs.' Br. 2, ECF No. 47-1. However, Intervenor Defendants did not comply with certain requirements for filing a motion for summary judgment, such as providing a statement of facts. *See* Fed. R. Civ. P. 56(c); N.D. Ga. Civ. R. 56.1(B)(1). Instead, they ask the Court to evaluate the motion for summary judgment under the motion to dismiss standard. Intervenor Defs.' Br. 2, ECF No. 47-1. Plaintiffs agree with this approach. Pls.' Resp. Br. 2 n.1, ECF No. 50.

The key issue here is one of timing. Even if the Court declined to consider Intervenor Defendants' motion at this time, Intervenor Defendants can simply re-file the same motion and seek judgment on the pleadings, pursuant to Rule 12(c), once State Defendants answer the Complaint. Because motions to dismiss and motions for judgment on the pleadings are evaluated under the same standard, efficiency considerations militate in favor of considering the merits of Intervenor Defendants' motion under the motion to dismiss standard at this time. *See Brown v. Wells Fargo Bank, N.A.*, No. 3:17-CV-00044-TCB-RGV, 2018 WL 6694897, at

*4 (N.D. Ga. Oct. 11, 2018) (stating that the Rule 12(b)(6) and 12(c) standards are the same, with the key difference between the two rules being the time of filing), *report and recommendation adopted*, No. 3:17-CV-44-TCB, 2018 WL 6694921 (N.D. Ga. Dec. 3, 2018).

This result is particularly supported where, as here, Plaintiffs have endorsed this approach.  It also serves no purpose to delay considering Intervenor Defendants' motion to dismiss in this case when the Court is concurrently resolving similar motions filed by Intervenor Defendants in related voting cases where the timing issue does not exist.

### B.    Standing[2]

To satisfy standing requirements under Article III of the United States Constitution, a plaintiff must show:

---

[2] Standing is jurisdictional, *see Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991), and a motion to dismiss for lack of standing can rest on either a facial or factual challenge to the complaint, *see Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).  In evaluating a facial challenge, a court considers only the allegations in the complaint and accepts them as true, whereas in a factual challenge, a court considers matters outside the pleadings, such as testimony and affidavits.  *See Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003).  Here, the parties do not reference matters outside the Complaint with respect to their standing arguments.  Therefore, the Court will evaluate State Defendants' standing argument as a facial challenge and will limit its analysis to facts alleged in the Complaint.

(1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  These requirements ensure federal courts adjudicate only actual "cases" and "controversies."[3]  *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019).

### 1.    Injury

"'[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing [it] to divert resources to counteract those illegal acts.'"  *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (quoting *Fla. State Conf. of*

---

[3] "Where only injunctive relief is sought, only one plaintiff with standing is required."  *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1118 (N.D. Ga. 2020) (quoting *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018)); *see also, e.g.*, *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) (finding that it was not necessary to consider the standing of other plaintiffs where standing was established as to one plaintiff); *Glassroth v. Moore*, 335 F.3d 1282, 1293 (11th Cir. 2003) ("Having concluded that those two plaintiffs have standing, we are not required to decide whether the other plaintiff, the one who has not altered his behavior . . . , has standing.").  Therefore, the Court's analysis will focus on one plaintiff for the purpose of deciding the instant motions to dismiss.

*NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)).  In *Common Cause/Georgia*, the Eleventh Circuit Court of Appeals found that the plaintiff had established an injury sufficient to challenge a Georgia voting statute because the plaintiff planned to divert resources from its regular voter registration, mobilization and education activities to a campaign to educate and assist voters in complying with the new voter photo identification requirement under the challenged statute. *See id.*  The court reasoned that this diversion constituted an adequate injury because it would cause the organization's noneconomic goals to suffer.  *See id*. at 1350-51.  Courts have found that a sufficient injury is demonstrated for standing purposes even when the diversion of resources is only "reasonably anticipate[d]."  *E.g.*, *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (alteration in original) (internal punctuation and citation omitted).

Here, the Complaint alleges that SB 202 will cause Plaintiff Mijente, Inc. ("Mijente") to divert resources away from its core activities to initiatives that will help their constituents navigate SB 202's changes to the election process.  Mijente states that it "launched voter outreach programs in 2018 to engage Latinx voters in the midterm federal election," and in 2020, it "contacted every Latinx voter in the state of Georgia, totaling over 300,000 voters."  Compl. ¶¶ 34-35, ECF No. 1.  In further support of its mission, "Mijente trained over 50 voter protection volunteers

to provide non-partisan information at polling places around the state." *Id*. ¶ 35.  It also "created culturally relevant memes, info-graphics, and other digital media content to combat disinformation and provide voters with important information regarding their rights." *Id*. ¶ 36.

Mijente alleges that SB 202 "threatens to undermine" its mission because it "must divert scarce resources away from its traditional voter education and turnout programs toward efforts to ensure that voters, and communities of color in particular, can navigate the restrictions to their voting options imposed by SB 202." *Id*. ¶ 38.

Based on these allegations, which are analogous to those asserted by the organization plaintiff in *Common Cause/Georgia*, the Court finds that Mijente has alleged a diversion of resources that is sufficient to show an injury for standing purposes.[4]  *See Common Cause/Georgia*, 554 F.3d at 1350.

The Court is not persuaded by State Defendants' argument that Mijente lacks standing because its alleged diversion of resources is too speculative and not different in nature from its current work.  *E.g*., State Defs.' Br. 4-5, ECF No. 46-1. In *Common Cause/Georgia*, the court noted that one of the plaintiffs was "actively

---

[4] Notwithstanding this decision, Plaintiffs will be expected to prove at trial that they have indeed suffered an injury to be entitled to relief.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.21 (1982).

involved in voting activities" and planned to divert resources "to educate and assist voters" in complying with the challenged voting identification requirements. 554 F.3d at 1350. In finding that standing was established there, the court focused on the *diversion* of resources—the shifting of resources from one activity to another—as the essence of the inquiry and did not mention, much less impose, the counterintuitive requirement that the new activities must further a different purpose within the organization. *Id*. And, as stated above, a reasonably anticipated diversion of resources suffices.

Even the court in *Common Cause Indiana v. Lawson*, which State Defendants cite in support of their position, had a "hard time imagining" why "an organization would undertake any additional work if that work had nothing to do with its mission." 937 F.3d 944, 955 (7th Cir. 2019). In the end, the *Common Cause Indiana* court concluded that the voting advocacy organizations had established an injury for standing purposes by showing that they planned to expand voter education programs, among other things, to counter the effects of the challenged statute. *Id*.

Additionally, State Defendants' reliance on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), is misplaced. The Supreme Court of the United States in *Clapper* found that the plaintiffs lacked standing because the

future injury they identified was not certainly impending where they did not have knowledge of the government's enforcement practices relating to the statute, and they could not provide a credible basis for their fear of prosecution under the statute. *Id.* at 411. Unlike in *Clapper*, the key standing question here is whether Mijente has demonstrated that SB 202 will cause it to divert resources away from its normal activities, not necessarily whether it faces potential prosecution under SB 202.

The opinion in *Tsao v. Captiva MVP Restaurant Partners, LLC*, 986 F.3d 1332 (11th Cir. 2021), which State Defendants cite as an additional reason to find that Plaintiffs lack standing in this case, similarly does not require a different result. *Tsao* involved an "insubstantial," "non-imminent" and general threat of identity theft to an individual as a result of a data breach. *Id.* at 1345. That type of case is thus quite different from the instant pre-enforcement challenge to SB 202.

In any event, it is well settled that "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging [a] law." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (internal punctuation omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). To the contrary, "'the very purpose of the Declaratory Judgment Act'" is to address the "[t]he dilemma posed by . . . putting the challenger to the choice

between abandoning his rights or risking prosecution." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152 (1967)).  Therefore, courts allow a plaintiff to bring a pre-enforcement suit "when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Wollschlaeger*, 848 F.3d at 1304 (internal punctuation omitted) (quoting *Driehaus*, 573 U.S. at 159).  This type of injury is not considered too remote or speculative to support standing.  *See id*. at 1305.

Based on the foregoing analysis, the Court finds that the Article III standing requirements to bring this suit are satisfied by at least Mijente.[5]

## C.    Failure to State a Claim

Having resolved the threshold standing issue, the Court now turns to Defendants' arguments that the Complaint fails to state a claim upon which relief may be granted.

---

[5] State Defendants do not address the traceability and redressability prongs of the standing analysis and have therefore waived their arguments on these points.  *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) (stating that "the failure to make arguments and cite authorities in support of an issue waives it").

In evaluating a motion to dismiss under Rule 12(b)(6), a court "accept[s] the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff."[6] *Traylor v. P'ship Title Co.*, 491 F. App'x 988, 989 (11th Cir. 2012). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal punctuation and citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that a complaint does not suffice "if it tenders 'naked assertions' devoid of 'further factual enhancement'" (alteration omitted) (quoting *Twombly*, 550 U.S. at 557)).

Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "This standard does not require a party to plead facts with such particularity to establish a significant probability that the facts are true, rather, it requires a party's pleading of facts to give rise to a 'reasonable expectation that discovery will reveal evidence

---

[6] A court is limited to reviewing what is alleged "'within the four corners of the complaint.'" *Hayes v. U.S. Bank Nat'l Ass'n*, 648 F. App'x 883, 887 (11th Cir. 2016) (quoting *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006)). If the court accepts matters outside the complaint, it "must convert the motion to dismiss into one for summary judgment." *Prop. Mgmt. & Invs., Inc. v. Lewis*, 752 F.2d 599, 604 (11th Cir. 1985).

[supporting the claim].'" *Burch v. Remington Arms Co.*, No. 2:13-cv-00185, 2014 WL 12543887, at *2 (N.D. Ga. May 6, 2014) (alteration in original) (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 570 (dismissing complaint because the plaintiffs did not state facts sufficient to "nudge[] their claims across the line from conceivable to plausible").

At bottom, the complaint must contain more than "an unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678, and must "'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,'" *Traylor*, 491 F. App'x at 990 (quoting *Speaker v. U.S. Dep't of Health & Hum. Servs.*, 623 F.3d 1371, 1380 (11th Cir. 2010)).

The Court will now address the question of whether Plaintiffs have satisfied their pleading burden with respect to each count of the Complaint.

1. **Count I (intentional discrimination and discriminatory results under § 2 of the VRA); Count II (intentional discrimination under the Fourteenth Amendment); and Count III (intentional discrimination under the Fifteenth Amendment)**[7]

Plaintiffs allege that SB 202 violates § 2 of the VRA under either the intent or results tests.[8]

---

[7] Complaints seeking to invalidate a voting statute on the grounds that it is discriminatory typically allege claims under § 2 of the VRA and/or the Fourteenth and Fifteenth Amendments.  *See, e.g.*, *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1329 (11th Cir. 2021).  VRA § 2 claims generally constitute allegations of vote dilution (*e.g.*, challenges to election districting schemes) or vote denial (*e.g.*, challenges to time, place or manner restrictions on voting, such as absentee and in-person voting rules).  Either type of claim may be asserted as a discriminatory purpose/intent claim (*i.e.*, the statute was enacted with discriminatory intent and has a discriminatory effect) or a discriminatory results claim (*i.e.*, the statute results in the abridgement of the right to vote under the circumstances).  *See Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991).  Claims brought under the Fourteenth and Fifteenth Amendment require proof of discriminatory intent and effect (whether in the vote dilution or vote denial context).  *See Greater Birmingham*, 992 F.3d at 1328-29.  Therefore, the analysis of Fourteenth and Fifteenth Amendment discriminatory intent claims mirrors that of § 2 intent claims.  In this case, Plaintiffs make vote denial allegations, which are styled as § 2 discriminatory intent and results claims (Count I); a Fourteenth Amendment discriminatory intent claim (Count II); and a Fifteenth Amendment discriminatory intent claim (Count III).

[8] Courts generally analyze discriminatory intent or purpose claims under the framework the Supreme Court established in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267-68 (1977).  However, *Arlington Heights* did not involve a voting statute, so it does not track or refer to the language of § 2.  Discriminatory results claims, on the other hand, are usually analyzed under the framework the Supreme Court developed in *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986).  *Gingles* involved a vote dilution claim, and the relevant analysis incorporates the text of § 2.

### a.     Intentional Discrimination

According to the Complaint, the challenged provisions of SB 202 were "purposefully enacted and operate[] to deny, abridge, or suppress the right to vote of otherwise eligible voter[s] on account of race or color."  Compl. ¶ 181, ECF No. 1.  Specifically, Plaintiffs assert that:

> (i) "Georgia has a long and well-documented history of voting discrimination against its communities of color," which began "shortly after Black men first gained the right to vote in 1868";

> (ii) "[s]ince 1990, the Black population in Georgia has almost doubled, increasing from 1.8 million to 3.5 million in 2019," and "the Latinx and Asian voting populations in Georgia have experienced significant growth, nearly tripling in size from 2000 to 2019";

> (iii) "Georgia added almost a quarter-million Black and Latinx voters to its registration rolls between October 2016 and October 2020," compared to the decline "over the last 20 years [in] the proportion of white registered voters";

> (iv) voting in Georgia is "consistently polarized by race" with 93% of Black voters supporting one candidate for governor in 2018 compared to 25% of white voters;

> (v) "[i]n response to record turnout by voters of color, and against a backdrop of false, racially charged allegations of widespread voter fraud, the General Assembly passed SB 202 just 79 days after the 2021 runoff elections";

> (vi) "[t]he legislative history of [SB] 202 reveals that the bill's passage was rushed, irregular, secretive, and an abuse of ordinary legislative process";

> (vii) the challenged provisions disproportionately affect minority communities and were "enacted, at least in part, with a racially

discriminatory intent to discriminate against Black voters and other voters of color";

(viii) "Black and Latinx populations in Georgia experience lower socioeconomic status than their white counterparts," including significant disparities in median household income; and

(ix) "SB 202 embodies unjustifiable, irrelevant and illegitimate state interests."[9]

*Id.* ¶¶ 68-69, 82-84, 86-87, 90, 182, 189.  The bottom-line allegation of the Complaint is that SB 202 was "intentionally enacted" to target and diminish the ability of minority voters to exercise the franchise.  *Id.* ¶ 189.

State Defendants' arguments for dismissal of Plaintiffs' intentional discrimination claims largely focus on the merits of Plaintiffs' allegations.  In a nutshell, they assert that Plaintiffs have not sufficiently alleged a disparate impact claim because SB 202's provisions are not burdensome, given Georgia's alternate voting options.  *See generally* State Defs.' Br. 7-18, ECF No. 46-1.

Intervenor Defendants make similar arguments but also contend that the Court should focus on the legislative findings underlying SB 202, which they assert are "the only reliable evidence of *the legislature's* purposes."  Intervenor Defs.' Br. 16, ECF No. 47-1.  In their view, those findings prove that SB 202 was

---

[9] The Court highlights only a few pertinent factual allegations here.

not enacted with discriminatory intent.  They argue that, at worst, the legislature was driven by the permissible purpose of securing partisan advantage.  *Id*. at 15.

In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, the Supreme Court of the United States identified a non-exhaustive list of factors that courts can use to evaluate whether government action was undertaken with discriminatory intent.[10]  429 U.S. 252, 267-68 (1977).  These include the "historical background of the decision"; the "specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence" in taking the action; "[t]he legislative or administrative history," including "contemporary statements by members of the decisionmaking body"; and whether the "impact of the official action . . . bears more heavily on one race than another."  *Id*.

Because the aforementioned allegations in the Complaint are consistent with the *Arlington Heights* factors and otherwise bear on the issue of intentional discrimination, the Court finds that Plaintiffs have stated a plausible discriminatory purpose/intent claim.[11]  At the motion to dismiss stage, Plaintiffs are not required

---

[10] Defendants do not dispute that *Arlington Heights* governs Plaintiffs' discriminatory purpose claim.

[11] Plaintiffs bring intent claims under § 2 as well as under the Fourteenth and Fifteenth Amendments.  Since all of these claims are analyzed in the same way, the Court's conclusion that Plaintiffs have stated a plausible discriminatory intent

to establish "a significant probability that the facts are true," *Burch*, 2014 WL 12543887, at *2, and only have to state facts sufficient to "nudge[] their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570.  They have done so here.

State and Intervenor Defendants' arguments, which attack the validity of Plaintiffs' allegations, are premature at this stage because they go to the merits of the claim and not to the question of whether Plaintiffs have asserted a plausible claim for relief.

Additionally, contrary to State and Intervenor Defendants' contentions that *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), established certain requirements that Plaintiffs failed to meet here, the Supreme Court in that case expressly "decline[d] . . . to announce a test to govern all VRA § 2 claims" involving time, place or manner voting restrictions, *id*. at 2336.  The Supreme Court explained that *Brnovich* was its "first foray" into deciding this type of claim and therefore found it "sufficient for present purposes to identify certain ***guideposts***" that led to its decision rather than to mandate a test that must be satisfied in all circumstances.  *Id*. (emphasis added).  Thus, while the language in

---

claim applies to Plaintiffs' § 2 intent claim (Count I) as well as to their Fourteenth Amendment (Count II) and Fifteenth Amendment (Count III) intent claims.

*Brnovich* could portend future requirements to state or prove a § 2 time, place, or manner claim, it should not be interpreted as currently setting forth pleading requirements that Plaintiffs must fulfill in this case.[12]

Likewise, while the Court acknowledges that the *Brnovich* opinion discusses the legislators' intent in passing the challenged statute, that analysis does not support State and Intervenor Defendants' position that *Brnovich* now requires plaintiffs in cases such as this one to allege that the legislature as a whole acted with discriminatory intent.  The Supreme Court's discussion of intent in that case occurred in the course of its review of whether the district court's interpretation of the evidence of discrimination was "permissible" under the clearly erroneous standard of review.  *Id.* at 2349.  The district court found no indication that the legislature "as a whole" was motivated by race, despite evidence in the record that a video reflecting a racial appeal played a role in the legislature's actions.  *Id.* at 2349-50.  The Supreme Court concluded that the district court's finding was not clearly erroneous.  *Id.*  When viewed in context, this finding does not establish a

---

[12] *Compare Guideline*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/guideline (last visited Dec. 6, 2021) ("an indication or outline of policy or conduct") *with Requirement*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/requirement (last visited Dec. 6, 2021) ("something essential to the existence or occurrence of something else"). "Guideline" and "Guidepost" are equivalent in the Merriam-Webster dictionary.

new test to state a VRA § 2 discrimination claim, especially in light of the

Supreme Court's express disavowal of doing so.

### b.      Discriminatory Results

In addition to the allegations set forth above, the Complaint asserts that "SB

202 further violates [§] 2 of the Voting Rights Act because, given the 'totality of

the circumstances,'" the challenged provisions "will disproportionately deny voters

of color, and particularly Black voters, an equal opportunity to participate in the

political process and to elect representatives of their choice."  Compl. ¶ 178, ECF

No. 1.

State and Intervenor Defendants make similar arguments in seeking

dismissal of Plaintiffs' voting claims under the results test.  Like State Defendants,

Intervenor Defendants argue that the challenged provisions of SB 202 "impose

nothing beyond the usual burdens of voting"; "Plaintiffs [improperly] focus on

how each provision of SB 202 burdens a particular method of voting, without

considering the [s]tate's entire [voting] system"; and "Plaintiffs misstate the

strength of the state interests behind the challenged laws."  Intervenor Defs.' Br.

12-14, ECF No. 47-1.  Intervenor Defendants also contend that Plaintiffs have

failed to assert certain facts required by *Brnovich*, including "allegations

comparing Georgia's laws with those of other [s]tates" and "'the size' of any racially disparate impacts." *Id*. at 13.

A violation of § 2 of the VRA

> is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the [s]tate or political subdivision are not equally open to participation by members of a [protected] class . . . in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).  To evaluate a results claim under § 2 of the VRA, courts have relied on the factors that the Supreme Court identified in *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986), such as the extent of any history of discrimination affecting the right to vote, the scope of racially polarized voting and the degree to which discrimination hinders the class's ability to participate in the voting process.[13]

However, the Supreme Court's opinion in *Brnovich* called into question the usefulness of some of the *Gingles* factors in evaluating a vote denial claim under § 2 of the VRA.[14]  *Brnovich*, 141 S. Ct. at 2340.  The Supreme Court identified other

---

[13] Not all factors will be pertinent or essential to all claims.  *See Nipper v. Smith*, 39 F.3d 1494, 1526-27 (11th Cir. 1994).

[14] *Gingles* was a vote **dilution** case, wherein the plaintiff claimed that legislative districting plans diluted the ability of particular voters to affect the outcome of elections.  478 U.S. at 47.

relevant factors, but, as discussed above, it was careful to define those factors as mere guideposts.  *See id.* at 2336.  These guideposts include the size and degree of the burden on voting, the size of the disparities between the protected class and other groups, the opportunities provided by a state's voting system, etc.  *See id.* at 2336, 2338-39.  Because this list is neither exhaustive nor prescriptive, *Brnovich* does not require Plaintiffs to plead any specific set of factors.

Here, Plaintiffs' allegations identified above correspond with *Gingles* factors that may be relevant in this specific circumstance and ultimately weigh upon the issue of whether the political process in Georgia is equally open to all voters. Therefore, Plaintiffs have stated a plausible claim under § 2 of the VRA.

State and Intervenor Defendants' arguments regarding the burden on voters, Georgia's voting system as a whole and Georgia's underlying interests in enacting SB 202 may be relevant to the analysis of Plaintiffs' claims at a later stage of this case.  However, those contentions investigate the merits of the claims, and their resolution requires an inquiry into facts not alleged in the Complaint.  Therefore, they are not appropriate at the motion to dismiss stage.

Further, as the Court explained above, the *Brnovich* factors are not prescriptive.  Thus, contrary to Intervenor Defendants' position, Plaintiffs are not required to allege those factors or otherwise provide detailed facts regarding them.

*See id.* at 2336; Fed. R. Civ. P. 8(a)(2) (requiring a plaintiff to provide only "a short and plain statement of the claim showing that the pleader is entitled to relief").

Based on the foregoing analysis, the Court finds that Plaintiffs have stated a VRA § 2 claim under both the intent and results tests.  For this reason, the Court declines to dismiss Counts I, II and III of the Complaint.

> **2.   Count IV (undue burden on the right to vote under the First and Fourteenth Amendments)**

Plaintiffs allege that the "challenged provisions of [SB] 202 collectively and individually impose severe and, at a minimum, significant burdens on eligible Georgia voters' right to vote, including on Plaintiffs and members of Plaintiffs' organizations."  Compl. ¶ 193, ECF No. 1.  The Complaint contains a detailed description of how SB 202's provisions, including regulations regarding mobile voting units, the prohibition of line warming,[15] additional requirements for absentee voting and restrictions on drop boxes will burden the right to vote of voters of color, disabled voters and others.  *See* Compl. ¶¶  110-72.  According to Plaintiffs, "[n]one of the burdens imposed by the challenged provisions . . . are

---

[15] "Line warming" refers to the provision of refreshments, such as food and drinks, to voters standing in line to vote at a polling place.  *See* Compl. ¶ 19, ECF No. 1.

necessary to achieve . . . any sufficiently weighty legitimate state interest."  *Id*. ¶ 194.

State Defendants respond that Plaintiffs have not established an actionable burden under the *Anderson/Burdick* framework for evaluating voting rights claims because the changes to the election process present "merely routine inconveniences arising from life's potential vagaries," and they "advance compelling governmental interests."  State Defs.' Br. 19, ECF No. 46-1.

Intervenor Defendants additionally argue that because "[m]ost of the challenged provisions of SB 202 regulate only absentee voting," "the right to vote is not at stake here."  Intervenor Defs.' Br. 4, ECF No. 47-1 (internal punctuation omitted).  They also argue that "[t]he only burdens that Plaintiffs assert are legally irrelevant because they are special burden[s] on some voters, not categorical burdens on all voters."  *Id*. at 6.

In resolving an undue burden on voting claim, a court must:  (i) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; (ii) "identify and evaluate the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule"; (iii) "determine the legitimacy and strength of each of those interests"; and (iv) "consider the extent to which

those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The analysis is not a "litmus-paper test" and instead requires a "'flexible'" approach. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (citation omitted). If a court finds that a plaintiff's voting rights "are subjected to severe restrictions, the [respective] regulation must be narrowly drawn to advance a state interest of compelling importance. But when [the law] imposes only reasonable, nondiscriminatory restrictions . . . , the [s]tate's important regulatory interests are generally sufficient to justify the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal punctuation and citation omitted).

Here, the Complaint contains detailed allegations of burdens that Plaintiffs assert the challenged provisions will impose on Georgia voters. Plaintiffs also maintain that there are no legitimate state interests that would support such burdens. *Anderson* and *Burdick* do not require more from Plaintiffs at the motion to dismiss stage. And State and Intervenor Defendants' weighing of the alleged burden on voters, which relies on facts not asserted in the Complaint, is not appropriate at this time.

The Court also declines, as Intervenor Defendants suggest, to forego the undue burden analysis the Supreme Court developed in *Anderson* and *Burdick* and

summarily dispose of Plaintiffs' voting rights claims.  The Court does not read

*McDonald v. Board of Election Commissioners*, 394 U.S. 802, 807-08 (1969),

which states that there is no right to an absentee ballot, to require such an outcome.

As described above, the *Anderson-Burdick* framework requires the Court to

evaluate the type of burden imposed by the challenged provisions and apply the

corresponding level of review.  "Only after weighing [the designated] factors is the

reviewing court in a position to decide whether the challenged provision is

unconstitutional."  *Anderson*, 460 U.S. at 789.

For all these reasons, the Court declines to dismiss Count IV of the

Complaint.

### 3.      Count V (freedom of speech/expression under the First Amendment)

Plaintiffs allege that distributing food and drink to voters waiting in line and

encouraging them to stay in line constitute speech and expression protected by the

First Amendment.  Compl. ¶¶ 154, 196, ECF No. 1.  The Complaint further

explains that the SB 202 provisions prohibiting such conduct "unconstitutionally

burden Plaintiffs' First Amendment rights of speech and expression[] and are not

supported by any sufficient, let alone compelling, government purpose."  *Id*. ¶ 196.

State Defendants counter that the prohibition on line warming is "critical to

maintaining electoral integrity" and is "a permissible legislative determination

because [s]tates may restrict even campaign speech near polling locations and precincts."  State Defs.' Br. 21, ECF No. 46-1.  Their position is that SB 202's restriction on line warming passes muster because it is "the only practical solution" to further the state's interests.  *Id*. at 22.

Intervenor Defendants additionally argue that the First Amendment is not implicated because line warming "is conduct, not speech."  Intervenor Defs.' Br. 19, ECF No. 47-1.  They therefore assert that while the challenged provision will impose an "incidental" burden on speech, the statute should not be analyzed as one regulating speech.  *Id*.

The First Amendment prohibits the enactment of laws that abridge the freedom of speech.  *See* U.S. Const. amend. I.  Therefore, governments generally "ha[ve] no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)).

Regulation of speech based on the topic discussed or the idea or message expressed is presumptively unconstitutional and may be justified only if the government proves that the regulation is narrowly tailored to serve compelling state interests.  *See id*. at 165 (stating that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-

neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech" (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993))).

Taking as true Plaintiffs' allegations that SB 202 establishes what type of conduct and communication is permissible while engaging with voters who are waiting in line and construing those allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have plausibly alleged that SB 202's restrictions on line warming impinge on speech and/or expressive conduct in some way.

State Defendants do not provide support for their contention that such activities can be restricted simply because they occur near a polling place or that any voting line would presumptively occur in a non-public forum, where a lower standard of review would apply.  Nor do Intervenor Defendants cite any authority for the proposition that line warming *per se* cannot be considered expressive conduct under the First Amendment.  Indeed, they concede that line warming could impose some burden on speech.

In any event, answering the questions of whether line warming occurs in a nonpublic forum subject to greater restrictions; whether the associated speech or conduct is of the type protected by the First Amendment; what type of analysis

28

should apply; and whether the state has identified interests sufficient to meet the applicable standard requires the type of substantive merits inquiry that is not appropriate on a motion to dismiss.

For all these reasons, the Court declines to dismiss Count V of the Complaint.

### 4.   Count VI (discrimination under Title II of the ADA)

Plaintiffs allege that their members and constituents are qualified individuals with disabilities under the ADA.[16]  Compl. ¶ 204, ECF No. 1.  The Complaint asserts that SB 202 will disproportionately affect disabled voters, including by changing the absentee voting requirements and limiting the availability of drop boxes.  *Id*. ¶¶ 119, 130.  Plaintiffs conclude that the challenged provisions "individually and collectively fail to provide Georgia voters with disabilities . . . equal access and ability to vote as Georgia voters without disabilities" and that the regulations will deny the rights of eligible voters with disabilities "to vote as effectively as others in future elections."  *Id*. ¶ 206-07.

State Defendants' key argument in support of dismissal of this claim is that disabled voters have "multiple accessible voting options."  State Defs.' Br. 24-25, ECF No. 46-1.  Intervenor Defendants similarly argue that "Georgia gives voters

---

[16] Defendants do not dispute this point.

many ways to cast a ballot" and add that Plaintiffs cannot plead a plausible facial challenge to the ADA under these circumstances because they cannot show that the challenged provisions are invalid in every instance.  Intervenor Defs.' Br. 18-19, ECF No. 47-1.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The implementing regulations for this section of the ADA further specify that "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150.  Thus, to state a claim under the ADA, a plaintiff must establish

> "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability."

*Silberman v. Mia. Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019) (quoting

*Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)).

"A violation of Title II, however, does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity." *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001). Rather, a plaintiff states a claim under the ADA when the complaint alleges facts indicating that certain "services, programs, and activities" are not "readily accessible" by reason of a disability. *Id.*; *see also People First v. Merrill*, 467 F. Supp. 3d 1179, 1216 (N.D. Ala. 2020), *appeal dismissed*, No. 20-12184-GG, 2020 WL 5543717 (11th Cir. July 17, 2020) (stating that "exclusions under Title II need not be absolute").

In *Shotz*, the Eleventh Circuit found that the plaintiffs sufficiently stated a claim under the ADA where they alleged that trials in the courthouse were not "readily accessible" to them, given the courthouse's steep wheelchair ramps and unfit bathrooms. 256 F.3d at 1080. It did not matter to the court that the plaintiffs were able to attend trial, despite these obstacles. *Id.* The important point was that the courthouse was not ***readily*** accessible to the plaintiffs. *Id*.

Here, the Complaint contains allegations that the challenged provisions of SB 202 make it harder for disabled voters to cast their vote. Central to the claim is the contention that the challenged provisions impose burdens that disproportionately harm disabled voters and prevent them from participating fully and equally in the voting process. Even if, as Intervenor Defendants suggest, the

31

Court were to consider SB 202's provisions in the context of Georgia's voting system as a whole, the facts necessary to evaluate what accommodations the state provides for disabled voters and the scope and reasonableness of such accommodations are not alleged in the Complaint.  Therefore, those facts cannot be considered on a motion to dismiss.  Ultimately, the Court is left with only allegations of restricted access, which it must take as true at this stage, and which are sufficient to state a claim under the ADA.

Contrary to Intervenor Defendants' position, Plaintiffs need not show that the voting access allegedly denied here is absolute.  Both the text of the ADA and cases interpreting it are clear that a partial denial of access could be actionable.

For all these reasons, the Court declines to dismiss Count VI of the Complaint.

## III.   <u>CONCLUSION</u>

Based on the foregoing analysis, the Court **DENIES** Defendants' motions to dismiss (ECF Nos. 46, 47).

**SO ORDERED** this 9th day of December, 2021.

J. P. BOULEE
United States District Judge